UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

ANTHONY LEE HOSKINS,

    Plaintiff,

    v.    Case No. 05-C-113

MAURICE WOULFE, and
OFFICER POST,

    Defendants.

## DECISION AND ORDER

Plaintiff Anthony Lee Hoskins, a former Wisconsin state prisoner, filed this *pro se* civil rights action pursuant to 42 U.S.C. § 1983. He is proceeding on a Fourth Amendment excessive force during arrest claim against defendants Maurice Woulfe and Officer Post based on the allegations set forth in the May 19, 2005, amended complaint. Before the court are the plaintiff's motion for summary judgment, motion for impeachment, motion to appoint counsel, and motion for order to set a date for a pretrial conference. All of these motions will be addressed herein.

## FACTUAL BACKGROUND

On January 31, 2005, the plaintiff filed the complaint in this action. Although he originally requested leave to proceed *in forma pauperis*, he subsequently paid the filing fee. On May 5, 2005, the court screened the original complaint pursuant to 28 U.S.C. § 1915A and found that the plaintiff had stated sufficient facts to support an arguable Fourth Amendment claim. However, the original complaint only named Milwaukee Police Chief Nanette Hegerty as a defendant. Chief Hegerty was

dismissed for lack of personal involvement in the alleged constitutional violation and the court ordered the plaintiff to file an amended complaint naming the individual defendants involved in his Fourth Amendment claim. On May 19, 2005, the plaintiff filed his amended complaint, naming Maurice Woulfe and Officer Post as defendants.

**STANDARD FOR SUMMARY JUDGMENT**

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *McNeal v. Macht*, 763 F. Supp. 1458, 1460-61 (E.D. Wis. 1991). "Material facts" are those facts that, under the applicable substantive law, "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material facts" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The burden of showing the needlessness of trial–(1) the absence of a genuine issue of material fact; and (2) an entitlement to judgment as a matter of law – is upon the movant. However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Id.* at 267; *see also Celotex Corp.*, 477 U.S. at 324 ("proper" summary judgment motion may be "opposed by any of the kinds of

evidentiary materials listed in Rule 56(c), except the mere pleadings themselves . . ."); Fed. R. Civ. P. 56(e) ("When a summary judgment motion is made and supported as provided in [Rule 56(c),] an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavit or otherwise provided in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial"). "Rule 56(c) mandates the entry of summary judgment, . . . upon motion, against a party who fails to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmoving party. *Johnson v. Pelker*, 891 F.2d 136, 138 (7th Cir. 1989). "However, we are not required to draw every conceivable inference from the record – only those inferences that are reasonable." *Bank Leumi Le-Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir. 1991) (citation omitted).

**FACTS**

**1. Introduction**

Along with his motion for summary judgment, the plaintiff filed two affidavits, a motion for impeachment, a brief, and photographs 1-7. Both of the plaintiff's affidavits, for the most part, describe what is contained in Exhibits A-Q, which are attached to his brief. The plaintiff's motion for impeachment points out alleged inconsistencies in the defendants' evidence, and will be discussed *infra.* Facts for

this section are taken from the plaintiff's sworn Statement of Facts. (*See* Pl.'s Brief at 5.)

The defendants filed a response to the plaintiff's motion for summary judgment and impeachment, along with affidavits of defendants Woulfe and Post, and a transcript of the plaintiff's December 11, 2005, deposition. The defendants' facts for this section are taken from their proposed findings of fact which are set forth in their response brief.

The parties dispute many of the facts. Therefore, their respective versions of the facts are set forth in separate sections.

**2. Plaintiff's Version of the Facts**

On September 11, 2004, while in room #222 at the Village Inn Motel, the plaintiff suffered severe injuries and permanent scarring to his back right shoulder from burns caused by a taser. The taser caused third degree electrical burns that took several months to heal. The plaintiff was also tased on the left and right sides of his stomach by defendant Officer Woulfe. After the plaintiff was struck with both darts to the stomach, he collapsed to the floor in front of the T.V., and when he tried to get on his knees, defendant Officer Woulfe tased the plaintiff again. As the plaintiff jerked around on the floor from the electrical current, defendant Officer Post sprayed the suspect in the face with "OC." Then, defendant Officer Post used a baton on the plaintiff while he was disoriented and weak and blinded from the "OC" spray, and after being tased repeatedly.

After the plaintiff was tased for the fifth time, and was laying face down and incapacitated, defendant Officer Woulfe tased him three more times. Next, both officers put cuffs on the plaintiff, and then tased the plaintiff three more times. While the plaintiff was stunned, defendant Officer Woulfe rolled him on his side with defendant Officer Post's assistance and removed the probe from his stomach. While defendant Officer Woulfe reloaded the two darts, defendant Officer Post struck the plaintiff with a baton around both ankles. Then defendant Officer Woulfe used the taser again on the center of the plaintiff's back and after that he placed the taser gun on the plaintiff's back right shoulder, pressed down with his weight, and used the taser until the plaintiff's flesh was burned deeply.

While the plaintiff was shackled in the police wagon, one of the officers who was wearing glasses, tased the plaintiff again to the heart, and kept the taser going until the plaintiff passed out.

The district attorney dropped the resisting arrest charge after he was shown the photographs of the plaintiff's wounds.

**3. Defendants' Version of the Facts**

Defendants Officers Woulfe and Post are, and at all times relevant to the subject matter of this litigation have been, employed as City of Milwaukee police officers.

The events surrounding the plaintiff's arrest took place at approximately 9:40 a.m. on September 11, 2004. Defendant Post was the initial officer to arrive on scene, at the Village Inn Motel, which was located at 3001 West Wisconsin Avenue

in the City of Milwaukee. Defendant Post responded to a call which came over his police radio, relative to a "property damage in progress" complaint.

Upon defendant Post's arrival, he observed a crowd of people stopping and standing outside of the motel. Defendant Post observed that motor vehicles were also stopping and parking in the roadway, in front of the motel. He observed a crowd forming, making a semi-circle on the street. Defendant Post received information from the motel security guard which suggested to him that the motel was vacant of citizens, except for the plaintiff. Furthermore, defendant Post learned that the plaintiff was located on the second level, on the east side of the building.

Defendant Post observed the plaintiff leaning out from the framing of a large, broken picture window, which contained sharp, jagged glass. Defendant Post observed the plaintiff wildly throwing his arms about while loudly yelling out of the window. Defendant Post also observed that the plaintiff's hands and arms were bloodied. Defendant Post observed blood spilled on the window ledge, and dripping down the white siding of the motel, underneath the window, and glass, furniture and clothes on the lawn below. Defendant Post heard the plaintiff angrily yelling out the window about killing police and other people, and wanting everyone to see what he had done.

Defendant Post was dressed in a full Milwaukee police uniform, and operating a fully marked Milwaukee police squad car. When defendant Post observed the plaintiff observe him, it appeared that the plaintiff's anger level increased. The plaintiff then began to direct his threats at defendant Post. The plaintiff made

numerous threats regarding killing police and all white people. The plaintiff also shouted that he had been smoking crack cocaine all night long, and that he was ready to "kill" and/or "fuck [us] all up." Defendant Post believed that there was a strong possibility that someone, including the plaintiff, might be seriously hurt or killed as a result of the plaintiff's actions. It appeared to defendant Post that the plaintiff was in a psychologically unstable and/or drug-induced state, and that his verbalizations regarding his desire for a violent confrontation necessitated his call for backup officers. Defendant Post did make such a call, and requested a backup officer who was trained to operate a taser weapon. Defendant Woulfe responded to defendant Post's call.

Upon arrival, defendant Woulfe observed a black male, later identified as Tony Lee Hoskins, with a birth date of February 17, 1963, standing in front of the framing for a picture window, which had been broken out of the second floor motel room. Defendant Woulfe observed that the plaintiff was standing at that location in his room, while yelling "here comes the man with his nine. I'm going to kill you white mother fuckers. You're here to mess with the wrong nigger. This strong black man is going to fuck you all up." Defendant Woulfe observed items on the front lawn of the motel, strewn in the area under the broken window, which appeared to be clothing and pieces of furniture. Furthermore, defendant Woulfe observed that the plaintiff had blood smeared on his body, which he assumed was related to the broken window, as jagged pieces of glass remained in the framing. Also, defendant Woulfe observed the plaintiff repeatedly placing his hands on the window ledge, in

the area of the broken shards of glass. The plaintiff admits that he broke the window of his motel room, but claims that it broke as a result of him "tapping on it trying to get someone's attention downstairs." The window was approximately 36 by 40 to 50 inches in size. Defendant Woulfe determined that the plaintiff was in need of assistance, as he was posing a threat to his own personal safety, as well as potentially posing a threat to the safety of others in the area, and he appeared to be either under the influence of alcohol or drugs, or mentally disturbed.

Defendant Woulfe met with defendant Post on scene, and they walked up the stairs and down the blood-smeared hallway to the room where the plaintiff was located. The officers had been directed to that room by the motel security guard, who had already unlocked and opened the door to the plaintiff's room. Defendant Woulfe observed the plaintiff in the room, from the open doorway, and he observed blood smears, broken glass, and household items thrown around the room. The plaintiff admits that he was at the motel "getting high" with a friend, using marijuana and cocaine, and drinking alcohol.

Defendant Woulfe observed the plaintiff tensing and flexing his muscles, and positioning himself in a fighting stance. Defendant Post gave clear, loud commands to the plaintiff, telling him "you're under arrest, turn around and put your hands behind your back." The plaintiff ignored defendant Post's commands, and indicated that he was going to cause the officers physical harm. Defendant Woulfe was and is a trained taser operator, and at that time, he was in the process of removing his taser weapon, turning it on, and focusing the red laser dot, produced by the weapon,

on the center of the plaintiff's chest. Defendant Woulfe readied his taser for use, because the plaintiff appeared to be mentally unstable, and he did not respond to any of the verbal orders given to him by defendant Post. Furthermore, while the officers were initiating in a verbal discourse, the plaintiff continued to flex his muscles, make fists, and position his body in various fighting stances. Defendants Post and Woulfe determined that they would advance toward the plaintiff, in an attempt to physically take him into custody, because he was not complying with any verbal commands.

As defendant Post entered the room, defendant Woulfe observed the plaintiff advance toward defendant Post in an aggressive manner. In order to protect his partner and himself, defendant Woulfe deployed his taser weapon. The events which occurred in the plaintiff's room occurred rapidly, and while defendant Woulfe was under stress. However, defendant Woulfe believes that one of the two darts struck the plaintiff in the area of the center of his chest, and that the second dart did not strike the plaintiff, but rather landed on the floor in front of him. The plaintiff stopped only briefly, and appeared to get very angry, and then started to advance upon defendants Post and Woulfe again. Defendant Woulfe was backing up and trying to dislodge the dart cartridge from his taser weapon and reload same. Both defendants Post and Woulfe retreated out of the doorway, and down the hallway about ten feet, with the plaintiff coming after them. As defendant Woulfe was attempting to reload his taser weapon, defendant Post stepped in front of him, and

drew out his metal baton. The plaintiff then stopped his advance, and returned to his room.

Defendant Woulfe was able to reload another dart cartridge into his taser weapon, and then rejoined defendant Post at the doorway. The plaintiff again advanced toward defendants Post and Woulfe, in an aggressive, combative manner. In response thereto, defendant Woulfe deployed the second taser dart cartridge. The first dart hit in the chest area, and the second dart appeared to hit in the plaintiff's abdominal area. The plaintiff appeared to be incapacitated by the taser, and collapsed to the floor. Defendant Post then gave loud and clear commands to the plaintiff, ordering, "Lay down on your stomach. Hands out to your sides. Hands behind your back." The plaintiff obeyed each command, until it came time to put his hands behind his back. At that point, the plaintiff then started to use his arms to push himself up off of the floor. Defendant Woulfe then started another cycle of his taser weapon. Defendant Post again gave the plaintiff the same set of commands as noted above. The plaintiff followed the first two commands, and then started to get up again.

The plaintiff admits that he tried to get up off of the floor, after being ordered to lay on the floor by the officers. After repeating the commands and taser cycle three times without compliance, defendant Woulfe told defendant Post that they would have to handcuff the plaintiff while the taser weapon was charged, in case they needed to use the weapon. Defendant Woulfe then initiated a taser cycle, and defendants Post and Woulfe approached the plaintiff, to place him in handcuffs.

However, while they attempted to handcuff the plaintiff, he struggled. He attempted to pull away from defendants Post and Woulfe.

After being unable to successfully subdue the plaintiff with the use of their hands and bodies, defendant Woulfe was forced to use what is called a "drive stun" with his taser weapon. In other words, the weapon did not discharge darts, but the head of the weapon itself was brought into contact with the plaintiff, in an effort to force him to finally comply with the officers' orders. The "drive stun" maneuver appeared to subdue the plaintiff. The officers were then able to handcuff the plaintiff.

Once they had the handcuffs successfully placed on the plaintiff, defendant Woulfe turned his taser weapon off, and removed any dart cartridge tips from the plaintiff's body. Once the plaintiff was successfully handcuffed, he was removed by other officers from the room, but only after his legs were shackled. Defendant Woulfe had no further physical contact with the plaintiff. Each and every time defendant Woulfe did have contact with the plaintiff, his contact was made in response to the plaintiff's actions toward him. Defendant Woulfe's decision to use his taser weapon against the plaintiff was predicated upon his aggressive actions toward defendants Post and Woulfe, and his perception that such force was necessary to protect himself and his partner from physical harm, and to effect the arrest of the plaintiff.

Defendant Post agrees with defendant Woulfe's description of their initial approach toward the plaintiff. However, while defendant Woulfe was focused on reloading his taser weapon, defendant Post did make focused strikes with his baton

onto the plaintiff's body. Furthermore, defendant Post sprayed oleoresin capsicum (OC) spray (pepper spray) on the plaintiff, in an effort to gain control of him. Neither the use of the baton or the OC spray appeared to have any impact on the plaintiff, as he continued to refuse to obey the officers' commands, and he continued to struggle with them. With the combined efforts of defendants Woulfe and Post, through the use of all of the methods descried, they were finally able to force the plaintiff into compliance and place handcuffs on him.

Even after the plaintiff was placed into handcuffs, he continued to fight with the officers, by kicking and thrashing his body about. When other officers arrived on scene, the plaintiff was also placed in leg shackles for transport. Even after the plaintiff was restrained with handcuffs and leg restraints, he continued to fight with officers and yell death threats at them. The plaintiff asserts that the officers beat his ankles with a baton and continued to use a taser on him even after he was handcuffed and under control. The plaintiff had to literally be picked up by officers, and carried to an awaiting conveyance wagon.

Because of the plaintiff's appearance, drug-induced and/or psychiatric-induced level of hyperactivity, and because of the fact that he was bleeding, the officers transported the plaintiff to a medical facility for treatment and evaluation. Defendant Post rode with the plaintiff in the back of the conveyance vehicle, to monitor his condition. During the conveyance, the plaintiff did finally settle down and did not pose any further threat toward defendant Post.

The plaintiff admits that he pleaded "guilty" to the criminal-damage-to-property and disorderly-conduct charges he received as a result of the events of September 11, 2004.

**DISCUSSION**

The plaintiff contends that the court should grant his motion for summary judgment based on the defendants' needless use of force against him. He states that the "dispositions," affidavits, and other evidence submitted in this action demonstrate that he is entitled to judgment as a matter of law. (Pl.'s Brief at 8.) However, he goes on to say that "[t]he allegations in the plaintiff[']s affidavit and dispositions show a completely needles[s] use of force against a[] suspect who was subdued and incapacitated, while laying face down, there is a genuine issue of fact. The factual dispute is also materia[.]" (*Id.*) Furthermore, the plaintiff asserts that the "evidence will provide facts from which a reasonable jury will find that the plaintiff endured more punishment to the back and back right shoulder after he was subdued." (*Id.* at 10.)

The defendants contend that the plaintiff's motion for summary judgment must be denied because significant issues of material fact exist. According to the defendants, there are two divergent versions of the facts as they relate to the propriety of the defendants' use of force. Therefore, summary judgment is not appropriate at this time and this case should proceed to trial.

An arrestee's claim for excessive force is analyzed under the Fourth Amendment's objective reasonableness standard. *Graham v. Connor*, 490 U.S.

386, 388 (1989). In determining whether an officer's use of force is reasonable, courts must balance the nature and quality of the intrusion upon the individual's Fourth Amendment rights against the countervailing government interests at stake. *Johnson v. LaRabida Children's Hosp.*, 372 F.3d 894, 898 (7th Cir. 2004). Reasonableness is judged from the perspective of whether the officer's actions were objectively reasonable in light of the facts and circumstances confronting the officer at the time. *Id.* When assessing whether the amount of police force was reasonable, the court looks to circumstances indicating, 1) the severity of the suspected crime, 2) whether the suspect posed an immediate threat to the officer on the scene or others, and 3) whether the suspect was actively resisting or attempting to evade arrest. *Id.*

The plaintiff avers that he was tased and that unreasonable force was used against him after he was subdued. The defendants, on the other hand, aver that their use of force was based on the plaintiff's own actions. Genuine disputes of material fact exist in this case and therefore, the plaintiff's motion for summary judgment will be denied.

## PLAINTIFF'S MOTION FOR IMPEACHMENT

The plaintiff filed this motion pursuant to Federal Rule of Civil Procedure 32(a)(1) and Federal Rule of Evidence 801. He requests that the court disallow any conflicting statements or testimony of the defendants and he cites to various inconsistencies in the record. For example,

> Officer Woulfe wrote and gave a testimony stating he watched officer Post delivery [sic] "three focused strikes to the right knee with

the baton." Exhibit (D) #2, and (D) #1; but on Exhibit (N) #1, response no.2, officer Woulfe stated that he did not observe any strikes with the baton, because he was focused on reloading a dart cartridge onto taser.

(Pl.'s Mot. for Impeachment ¶ 1.)

However, as the defendants point out, the inconsistencies suggest credibility issues which should be determined by a jury, and not the court. Thus, the plaintiff's motion for impeachment will be denied.

## PLAINTIFF'S MOTION TO APPOINT COUNSEL

The plaintiff has filed a motion for appointment of counsel. The *in forma pauperis* statute provides that "[t]he court may request an attorney to represent any person unable to afford counsel." 28 U.S.C. § 1915(e)(1). However, the plaintiff is not proceeding *in forma pauperis* in this case and therefore it has not been determined that he is indigent. The court also notes that the plaintiff was released from prison on May 2, 2006. Thus, the plaintiff's motion to appoint counsel will be denied at this time. He may re-file a motion for appointment of counsel after advising the court of his financial situation. The plaintiff may request an application to proceed *in forma pauperis* from the clerk's office.

## PLAINTIFF'S MOTION FOR PRETRIAL CONFERENCE

On April 11, 2006, the plaintiff filed a motion for a pretrial conference. However, the court will schedule relevant trial dates in a subsequent order. Therefore, the plaintiff's motion will be denied.

**ORDER**

**IT IS ORDERED** that the plaintiff's motion for summary judgment (Docket #63) be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that the plaintiff's motion for impeachment (Docket #66) be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that the plaintiff's motion to appoint counsel (Docket #76) be and the same is hereby **DENIED**; and

**IT IS FURTHER ORDERED** that the plaintiff's motion for order to set a date for a pretrial conference (Docket #77) be and the same is hereby **DENIED**.

Dated at Milwaukee, Wisconsin, this 4th day of August, 2006.

BY THE COURT:

s/ J. P. Stadtmueller
J. P. Stadtmueller
U.S. District Judge